## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **RACHELLE H. JONES**, | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-0034 |
| | § | |
| **CAROLYN W. COLVIN,**[1] | § | |
| Acting Commissioner of Social | § | |
| Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM AND RECOMMENDATION

In this case seeking judicial review of denial of Social Security benefits, Plaintiff

Rachelle H. Jones ("Jones") filed a Motion for Summary Judgment on September 18,

2013. Dkt. 12. Defendant Carolyn W. Colvin, Acting Commissioner of Social Security,

filed her own Cross-Motion for Summary Judgment and Brief in Support on November

15, 2013. Dkt. 15. The case has been referred to this Court pursuant to 28 U.S.C.

§ 636(b)(1) and the Cost and Delay Reduction Plan under the Civil Justice Reform Act.

Dkt. 3. Having considered the parties' briefing, the applicable legal authorities, and all

matters of record, the Court **recommends** that Jones' motion be **DENIED** and summary

judgment be **GRANTED** for the Acting Commissioner.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 24, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be
substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to
continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42
U.S.C. § 405(g).

## I.    BACKGROUND

Jones is a 37-year-old woman who suffers from physical and mental health issues. Jones is five feet, two inches tall and weighs approximately two hundred and twenty-eight pounds. Tr. 37.  Jones has a high-school education and has completed some college courses.  She has worked as a bus driver, security guard and sales associate.

Jones lives with her husband, her three sons, and a friend.  Tr. 37.  She suffers from physical problems including fibromyalgia, shoulder pain, knee pain, diabetes, ovarian disease, back pain, degenerative disc disease, and obesity.  Jones also suffers from mental problems.

## II.    MEDICAL EVIDENCE

In a document submitted on January 22, 2008 to Peak Performance Sports Medicine and Injury Clinic, Jones reported having sinus surgery in 1993, and stated that she had two knee surgeries in 1995 and 1996—a meniscus repair and an ACL repair. Tr. 410.  These surgeries do not appear in the submitted medical records.[2]

In November 2003, Jones went to the emergency room complaining of "a three-day history of pains, redness, and swelling in her right axillary region, lower abdominal wall bilaterally, and in the pubic region."  Tr. 692.  Jones was diagnosed with two skin abscesses caused by MRSA, and she underwent surgery to remove the infections.

---

[2] The record in this case is voluminous.  Jones' medical records relate to a variety of medical complaints, including routine complaints such as upper respiratory infections and a cut on her finger.  The submitted records date back as far as 1997.  The Court has reviewed all of Jones' submitted medical evidence.  Many of the surgical procedures Jones alleges she has undergone are not substantiated by the documents.

EX. 6-F.  On November 23, 2003, Jones followed up with Dr. Milton B. Kirkwood at the Bayshore Medical Center.  Dr. Kirkwood described Jones as "a 29-year-old morbidly overweight white female with past medical history of hypertension and depression." Tr. 692.  This medical history appears to have been self-reported.

In February 2006, Jones was treated by Dr. Keith Schauder for left knee pain. Tr. 349.  Jones reported that she tripped over her son's bike and that she had pain and swelling in her knee.  She was prescribed Vicodin and other medications and was told she could return to work in one week.

On January 20, 2007, Jones again went to the emergency room, complaining that her right knee was injured when she was struck by a salon chair at Wal-Mart.  Tr. 679. Some swelling near her knee was observed, and she reported pain when she bore weight on her leg.  Tr. 676.  However, an x-ray indicated that there was no bone injury.  Tr. 681. On January 23, 2007, Jones was seen by an orthopedist, who examined her and told her to return in two weeks.  Jones felt that the orthopedist was "unhelpful," so instead went to her primary care physician, Dr. Vivian Hartig.  Tr. 795.  Dr. Hartig noted that Jones seemed to be in "moderate pain" and that Jones was using crutches and a knee brace. Tr. 796.  Dr. Hartig also noted that Jones had a slowed gait.  Jones' muscle strength, however, was rated at a 5/5 and her overall muscle tone was found to be normal.  Tr. 797. Dr. Hartig observed that Jones had an appropriate affect and demeanor, normal speech pattern, and normal thought and perception.  Tr. 797.  Jones underwent an MRI exam the same day, which revealed "complete rupture of the anterior cruciate ligament near its attachment to the femur."  Tr. 798.

Dr. Schauder performed an ACL reconstruction surgery on Jones' right knee on February 23, 2007. Tr. 339. Dr. Schauder noted no complications with the surgery. Tr. 339.

For the next few months, Jones was seen sporadically at ProActive Physical Therapy Center. Tr. 302. She missed at least four appointments, however, due to either a sick child or being sick herself. Tr. 299. During physical therapy, Jones reported "feeling better," and by April 17, 2007, she stated she was "feeling great" although there was still some pain while walking. Tr. 332, 331. On April 20, 2007, therapy notes recorded that Jones still complained of pain, but the therapist's opinion was that Jones' prognosis was "good/fair." Tr. 330, 329.

In June 2007, Jones again returned to Dr. Schauder. Jones reported that she was still experiencing "lots of popping [and] grinding" and that she was "very uncomfortable." Tr. 328. She also asked for a refill of her pain medications. Dr. Schauder refilled her prescription and ordered that she attend physical therapy at the YMCA.

Jones also saw Dr. Mullins for a follow-up visit with complaints of intermittent pain and popping in her right knee. She stated to Dr. Mullins that her "knee will give way on her and swells." Tr. 342. Upon examination, Dr. Mullins noted that Jones had "marked improvement in her range of motion," and that it was his impression that Jones had a torn anterior cruciate ligament ("ACL") but that he could not rule of a meniscus tear. Tr. 342. He noted that after discussion with Jones and her husband, Jones opted for

ACL reconstruction surgery despite the possibility that her symptoms could worsen "if she is unable to tolerate the therapy regimen." Tr. 342.

On December 10, 2007, Jones again saw her primary care physician, Dr. Hartig. Jones complained of sinus problems and "chronic back pain" that had been "bothering her for over a year." Tr. 778. Jones reported to Dr. Hartig that she had "some pain radiating down the left leg and does notice some numbness at times." Tr. 778. Although it was noted that Jones appeared to have a slowed gait and pain, Dr. Hartig also reported 5/5 muscle strength in all major muscle groups and normal muscle tone. Tr. 780. Dr. Hartig ordered x-rays and prescribed pain medication. Tr. 779-781. An x-ray report issued that day revealed "normal vertebral height and alignment" and "mild to moderate multilevel degenerative disc space narrowing," but "no acute findings." Tr. 782.

After seeing Dr. Hartig, Jones sought chiropractic care for her back pain. Beginning in December 2007, Jones was seen several times at by Robert Barton, D.C., at Peak Performance Sports Medicine. She initially reported "low and mid back pain" and numbness in her left leg. Dr. Barton diagnosed "significant mechanical dysfunction of the lumbar spine. . . [and] asymmetric muscle tightening between the hip flexors and hamstrings that contributes to the biomechanical stress on the lumbar spine." Tr. 425. Dr. Barton suggested an exercise program, ultrasound, and myofacial release techniques. *Id.*

On January 14, 2008, Jones reported injuring her back again while working as a school bus driver. Four days later, a January 18, 2008 MRI noted "mild anterior spondylosis," "mild disc protrusion," a "minimal dorsal bulge," and "minimal facet

arthrosis." Tr. 411. On January 22, 2008, Jones again sought chiropractic therapy for these new injuries from Dr. Barton. Tr. 407. By the end of February 2008, Jones reported improvement and rated her pain as a 3 out of 10, stating that pain medication and rest helped her back pain. Tr. 376. She reported, however, that the pain was "aggravated by activities involving sitting, standing and bending." *Id.* Dr. Barton noted an increased range of motion and recorded that Jones had returned to work, stating that he had told Jones that "she should be able to work through this pain." Tr. 377. Dr. Barton also noted that there was "no evidence of damage to her lumbar structures on the MRI" and that Jones' pain was primarily "muscular." *Id*.

On February 9, 2008 and March 14, 2008, Jones was seen at the emergency room for what were ultimately diagnosed as kidney stones. Tr. 668.

At the end of March 2008, Jones returned to Dr. Hartig. At this visit, Dr. Hartig noted that, "[Jones] states that she thinks she has fibromyalgia" and that Jones reported pain at places "she thinks [. . .] are trigger points." Tr. 764. Jones also stated that she experienced "pain all over all the time." Tr. 764. Dr. Hartig accordingly noted that Jones had "myalgias, unspecified," and advised Jones to try regular exercise and stretching exercises. Tr. 770.

In May 2008, Jones was diagnosed with polycystic ovarian syndrome by Dr. Arian. She underwent a hysterectomy on June 17, 2008. Tr. 933. After the surgery, Jones developed an infection in her incision. Tr. 559. On July 3, 2008, Jones returned to her primary care physician, Dr. Hartig, for wound care and a refill of her pain medication, vicoprofen. Tr. 754. Dr. Hartig noted that Jones was experiencing some edema, or

swelling, and recommended that Jones "keep [her] legs elevated and watch [her] salt intake." Tr. 756. By the end of the month, Jones had improved. On July 21, 2008, Dr. Arian examined her in a follow-up exam and he noted Jones denied "myalgias, fatigue" and that her physical exam was normal, with no edema. Tr. 934.

On October 24, 2008, Jones returned to the emergency room. Tr. 546. Jones reported that she had been involved in a car accident and that she was experiencing neck and back pain, "tingling," and headaches. Tr. 546, 547. An x-ray revealed "no evidence of fracture," and that Jones' cervical spine was "unremarkable." Tr. 555. Another x-ray of Jones' chest revealed "no active disease." Tr. 556.

Two weeks later, Jones again returned to the emergency room, reporting that she had been in a second car accident. She complained of pain in her neck and upper back, as well as in her shoulder, left leg and right hip. Tr. 534. Jones was described as "ambulatory /s any limp, no lower edema, full [range of motion] of arms, no bruising and is soft and pliant." Tr. 534. After a CT scan was "negative," Jones was discharged with a prescription for Vicodin and muscle relaxants. Tr. 542. The CT scan report noted "minimal degenerative changes and disc disease at C5-6" and "no acute osseous abnormality." Tr. 545.

On December 18, 2008, Jones saw Dr. Hartig for a respiratory illness. Jones also reported symptoms such as dizziness, earache, headache, panic attacks, and fatigue. Tr. 742. Dr. Hartig noted that Jones "is on Cymbalta for fibromyalgia," but that Jones did not think the medication was helping. Tr. 742. Jones also reported being "tired all the time" and "stressed with finances." The objective portion of the exam noted that

Jones was well groomed, in no apparent distress, with an appropriate affect and demeanor as well as a normal speech pattern and "grossly normal" memory. Tr. 744. After Jones reported snoring, Dr. Hartig noted, "I suspect sleep apnea." Tr. 745. A MRI performed that day revealed "normal alignment of the vertebral bodies" and "unremarkable" paravertebral soft tissues. Tr. 741.

Two days later, on December 20, 2008, Jones reported slipping at a McDonald's and injuring her ankle. Tr. 525. She went to the emergency room, and medical providers noted "patient ambulates /s any difficulty, no obvious deformity or bruising, pt has full ROM of ankle, pedal pulse strong." Tr. 525. Jones was discharged the same day, with no instructions or prescriptions. Jones made no mention of this injury when she saw Dr. Hartig on January 7, 2009. Instead, Jones complained of an upper respiratory infection, for which Dr. Hartig prescribed codeine cough syrup and other medications. Tr. 739.

On January 17, 2009, Jones again went to the emergency room. She reported that she "twisted her [right] ankle stepping in [a] pothole at work." Tr. 517. Jones stated that she "heard her [right] knee pop" and she fell, injuring her right hip. Mild swelling was seen, but Jones could bear weight on the leg. Tr. 517. Jones was discharged with instructions to ice her knee and to take vicoprofen for her pain. Tr. 523.

On January 22, 2009, Jones returned to Dr. Barton at Peak Performance. Tr. 368. Dr. Barton noted a reduced range of motion in Jones' right knee, although her coordination and heel/toe walk were "normal." Tr. 369. Dr. Barton prescribed further chiropractic treatments and exercises. Tr. 370. Jones continued to visit Dr. Barton though March 2009. Tr. 357. Although she reported that her knee pain was a 7 out of

10, Dr. Barton stated that her prognosis was "fair" and recommended continued chiropractic therapy and exercise.  Tr. 358.

On January 25, 2009, Anthony S. Melillo, M.D. saw Jones for right knee pain and gave her "1 cc of Celestone and 5 cc of lidocaine without epinephrine."  Tr. 1007.  Dr. Melillo determined that Jones' right knee pain and bone contusion were both improving but did note a meniscal tear.  Tr. 1007.  On January 27, 2009, a MRI on Jones' right knee revealed an intact ACL graft, a meniscus tear and marked stress response in various areas of her lateral tibial plateau.  Tr. 1009-10.  Jones returned to Dr. Melillo on March 25, 2009, complaining of persistant right knee pain.  Tr. 1000.  On April 7, 2009, Dr. Melillo performed an arthroscopy on Jones' right knee.  He found that she had a tear in her meniscus and only a 70-80% take of the prior ACL graft.  Tr. 1000-01.  On April 17, 2009, Dr. Melillo noted that Jones "ambulates well" and had a "[f]ull ROM." Accordingly, he released her to "light duty" work.  Tr.  998.

On February 3, 2009, Jones was seen at a sleep clinic.  She reported that she was sleepy during the day and snoring.  Her physical exam noted that she was obese, but was otherwise normal.  Tr. 737.  Jones was diagnosed with "Sleep Related Breathing Disorder, Unspecified" and counseled about good sleep habits.  A further sleep study was recommended.  Tr. 737.

On April 17, 2009, Jones again saw Dr. Melillo.  Tr. 452.  At this visit, Dr. Melillo recorded that Jones had "Dislocation of the knee; Tear of the medial/lateral cartilage/meniscus of the knee; [and] Dislocation of the patella."  Dr. Melillo required Jones to attend nine physical therapy treatments over 8 weeks.  Tr. 453.  However, Dr.

Melillo disputed Jones' claim that her injury "extends to include degenerative changes in… [her] right knee." Tr. 454. He further asserted that her condition was "a pre-existing, ordinary disease of life and not related nor naturally resulting from… [her] employment and/or injury on or about 1/20/2009." *Id.*

On May 5, 2009, Jones sought treatment at Aquatic Care Programs, Inc., as instructed by Dr. Melillo. Tr. 996. Three days later, on May 8, 2009, Dr. Melillo noted that Jones was "improving" but "still has some pain and weakness in the knee . . . [and] difficulty driving because of pain." Tr. 997. Although he noted a full range of motion in her knee and that Jones was "slowly improving," Dr. Melillo nonetheless stated that Jones "is unfit to drive a bus" and released her to "light duty." *Id.* On May 12, 2009, Jones underwent a Functional Capacity Evaluation at Aquatic Care Programs, Inc. That evaluation stated that Jones could lift and carry 10 pounds, stand for 15 minutes and walk for 20 minutes. Jones' pain was rated at a 3 out of 10. Tr. 986.

In September 2009, Jones again saw Dr. Hartig. Dr. Hartig noted that Jones had recently been fired from her job and that she was "crying and very upset." Tr. 729. Dr. Hartig diagnosed Jones with an "acute upper respiratory infection of multiple sites" and prescribed cold and cough medications. Tr. 731. Dr. Hartig made no mention of Jones' emotional or mental symptoms. A CT scan of Jones' abdomen and pelvis revealed "no acute abnormality demonstrated with the abdomen or pelvis." Tr. 916. A note from Dr. Arian stated that Jones was excused from work from October 12 through 15, 2009, but that she was cleared to return to work on October 16, 2009. Tr. 911.

In November 2009, Jones repeatedly complained of pain at the incision site of her hysterectomy. Tr. 870. After several examinations, Dr. Eduardo Wolffe performed a diagnostic laparoscopy and hernia repair. *Id.* Dr. Wolffe noted "extensive adhesive disease involving the entire lower abdomen densely adhered to the anterior abdominal wall." *Id.*

In January 2010, Jones was seen at the emergency room for flu-like symptoms. Tr. 505. She self-reported a history of panic attacks. *Id.* A chest x-ray revealed "minimal degenerative changes of the thoracic spine." Tr. 515. She was discharged with narcotic medication and a work excuse stating that she could return to work on January 25, 2010. Tr. 512.

In June and August 2010, Jones again saw Dr. Hartig for routine complaints, including complaints of dizziness. At one of these visits, however, she told Dr. Hartig that she was taking phentermine that had been prescribed by Dr. Arian. Tr. 723. Dr. Hartig reminded Jones of the necessity of drinking enough fluids during the day. Tr. 724.

In November 2010, Jones underwent another laparoscopy for her abdominal adhesions, as well as an appendectomy. Tr. 885. Hospital records note that she "recovered well from the surgery," but later reported a fall at her home "causing increased abdominal pain" and resulting in a visit to the emergency room. Tr. 885. Dr. Wolffe examined Jones, and reported that she was oriented, alert and without edema. Tr. 885. Dr. Wolffe prescribed "pain control" and Jones was discharged.

Jones filed her current application for social security benefits on December 14, 2010. Tr. 155, 164.

On January 5, 2011, Jones saw Dr. Hartig complaining of ear pain and a sinus infection with headaches. Tr. 1124. Jones reported to Dr. Hartig that she underwent gastric bypass surgery in November 2010, and that she had filed an application for social security benefits on the basis of "fibromyalgia and her knee and back pain." *Id.* Jones also told Dr. Hartig that she was depressed and crying. Jones attributed this to "hav[ing] to declare bankruptcy and losing all their cars," as well as to being off of her hormone medication. *Id.* Jones told Dr. Hartig that she was seeing a counselor for her depression. *Id.* Although Dr. Hartig noted that Jones was "tearful," she otherwise described her affect as normal, with normal speech pattern, and normal thought and perception. Tr. 1125. Dr. Hartig prescribed hormone medications and diagnosed Jones with a sinus infection.

An x-ray of Jones' right shoulder was performed on February 13, 2011. Tr. 882. That x-ray noted "no fracture or dislocation" and "no abnormal soft tissue calcification or soft tissue defect." Tr. 882. Less than one month later, on March 9, 2011, Jones was seen by Dr. Arian for a pre-surgical appointment. Tr. 905. Dr. Arian's notes state that Jones' physical exam was normal, she was without edema, and that no fatigue, sleep disturbances, or back or joint pain was reported. Tr. 905. The notes state that Jones had "lost weight, going for tummy tuck." Tr. 906.

On February 24, 2011, Jones saw Dr. Melillo, this time complaining of right shoulder pain caused by a fall in her bathroom. Tr. 982-83. Dr. Melillo determined that Jones had generalized tenderness, mild "MDI," and full passive movement. Tr. 983. He recommended ice, pain medication, use of a sling and rehabilitation. *Id.*

Jones returned to Dr. Melillo on March 17, 2011, still complaining of shoulder pain. Tr. 982-83. His physical examination noted that Jones "actually has a very good, unguarded ROM of the right shoulder" and that there was "mild instability to the shoulder, but with no weakness in the rotator cuff." Tr. 982. Dr. Melillo also noted both clicking and popping in the "G-H joint and subacromial space." *Id.* He assessed that she had "[r]ight shoulder pain with mild MDI, clinically improving … [and] depression." Tr. 982. On March 21, 2011, an MRI on Jones' right shoulder revealed that Jones had "mild to moderate supraspinatus tendinosis . . . without evidence of high-grade partial-or full-thickness tear [and] [e]dema and small amount of fluid throughout the subacromial-subdeltoid bursa." Tr. 980.

In October 2011, Jones again returned to Dr. Hartig with a sinus infection and seeking a refill of her hormone medication. She reported that she was seeing a psychiatrist for "anxiety and insomnia." Tr. 1127. Dr. Hartig noted that Jones appeared moderately ill, but that her physical exam was otherwise normal and that her affect was appropriate, along with normal psychomotor function, speech pattern, thought and perception. Tr. 1128. Two months later, in December 2011, Jones complained of "left abdominal pain." Tr. 1116. A CT scan of Jones' abdomen revealed "no acute findings in the abdomen or pelvis." *Id*.

In February 2012, Jones went to Texas Pain Consultant Associates complaining of a "long history of back pain" as well as knee pain. She described the pain as "constant," checking boxes stating it was sharp, pressure, stabbing, burning, aching, throbbing, numb like [sic], tingling, and stinging. Tr. 1139. She stated that all of the listed actions of

13

activity, bending, twisting, and reaching made the pain worse and that rest and heat made the pain better. Tr. 1139. She also reported smoking one pack of cigarettes every two or three days. Tr. 1142. When Jones met with Dr. Robert Sickler, she told him that her pain ranged between a 6 and a 10, but that it improved with "[over the counter] medication, heat, and/or ice." Tr. 1138. She also stated that the pain did not interfere with her ability to sleep. Jones also reported being on a variety of medications, including Prozac, Valium, Estradiol, Phentermine, Trazadone, Adderall and Metphormine. Dr. Sickler examined Jones and found that she did not have any edema or cyanosis, her sensory function was intact, and her motor and muscle functions were good. *Id.*

A subsequent MRI revealed a 3mm protrusion/herniation at T12-L1, along with mild posterior spondylosis (without significant nerve root compromise), and mild facet arthropathy at L4-5. Tr. 1135. Jones met with Dr. James Bonnen to review the MRI results and discuss surgery on her back. Dr. Bonnen noted Jones' gait was "normal" and "station stable." Tr. 1105. Additionally, he noted that her muscle strength was "5/5 [in] both arms and both legs" and that "muscle tone [was] normal for all four limbs." Tr. 1105. He described Jones as "oriented to time, place and person," with "good recent and remote memory," "adequate attention span and able to concentrate," with intact sensation and reflexes. Dr. Bonnen stated that he had reviewed Jones' MRI and that, "[a]lignment is satisfactory and there is minimal degenerative change and no significant stenosis." Tr. 1106. Accordingly, he concluded that, "[a]t this time I recommend against surgical intervention. I recommend the patient keep her scheduled appointment with the interventional pain management physician."

On February 27, 2012, Jones had a follow-up appointment at Texas Pain Consultant Associates with Dr. Barbara Barnett. Tr. 1137. Jones told Dr. Barnett that she had met with Dr. Bonnen on February 22, 2012 and "he stated that no surgery was needed." Jones told Dr. Barnett that she was out of pain medication and asked for a refill of Hydrocodone and Soma. Dr. Barnett's physical exam noted "lumbar guarding" but was otherwise normal, finding no edema along with full motor and muscle function. *Id.*

In May 2012, Jones again saw Dr. Hartig seeking refills for Hydrocodone and Cymbalta. Tr. 1131. Dr. Hartig's physical exam noted enlarged tonsils and that Jones was "morbidly obese," but was otherwise normal. *Id.* Dr. Hartig refilled Jones' prescriptions for Cymbalta, Vicodin, Keflex, Glucophage/Metformin, and Soma. Tr. 1132.

### III. CONSULTATIVE EXAMS AND STATE AGENCY OPINIONS

On March 10, 2011, Denis M. Feldman, Ph.D., conducted a Clinical Interview and Mental Status Examination, noting that Jones' chief complaint was alleged disability due to depression. Jones arrived at the interview "with an adult companion and three young children that she states she has been providing daycare for over the past three weeks." Tr. 895. According to Dr. Feldman, Jones was "attentive during the interview and did not need to have questions repeated." *Id.* Jones was the primary source of information regarding both her medical history and her current medical status, but Dr. Feldman noted that Jones' "medical records in support of her disability application were available at the time of the interview." *Id.*

Jones stated that she had a "variety of somatic symptoms related to feelings of anxiety and stress, including frequent nausea, chest pains, soreness, shortness of breath, and difficulty concentrating." Tr. 896. She also reported that she "shouts and screams in anger and often feels to urge to break things," and had "no interest in things anymore and feels blocked in getting anything done," in addition to "depressive feelings of loneliness, hopelessness, and feeling unappreciated." *Id.*

Dr. Feldman noted Jones was oriented to time, place and person, and appeared clean and adequately groomed. However, he also noted that her "[c]onversational productivity was good, but often tangential to the topic" and that her "[g]ross motor functioning seemed slowed." Tr. 896. Dr. Feldman determined that she was "[p]ositive for paranoia and worry about finances," but could "work with simple verbal concepts." *Id.* Dr. Feldman opined that Jones' "mood was depressed" and although her "[r]emote memory for personal information was intact …. [and] [s]hort-term memory was good," her "fund of information was very poor." Tr. 897. Jones reported that she been in treatment for depression for approximately five years and that she was taking medication for this condition. *Id.*

Jones stated to Dr. Feldman that she had been separated from her husband for seven years. Tr. 896. Dr. Feldman also recorded that Jones did laundry and cleaned for short periods of time as needed, but that she has relied more on her children to help her with household chores. Tr. 897. Further, Jones claimed that "prior to taking on the three children for daycare, that she was sleeping excessively, particularly when her two children were off at school during the daytime." She also stated that she was "showering

more and dressing each day since she took her job." Tr. 896. Jones also revealed to Dr. Feldman that she often failed to complete tasks assigned to her either because of pain or a lack of energy, and that "her persistence on even preferred tasks such as crafts" had been poor. *Id.* Dr. Feldman opined that Jones was able to manage benefit payments in her own interest and that she understood the meaning of filing for benefits. Tr. 899.

On March 22, 2011, Robert B. White, Ph.D., completed a Psychiatric Review Technique in which he determined that Jones had a "mild" degree of functional limitation in her activities of daily living and that she experienced "moderate" degrees of functional limitations in maintaining social functioning and concentration, persistence, and pace. Tr. 1019. Dr. White noted that the evidence did not establish Paragraph "C" criteria under listings 12.02, 12.03, or 12.04. Tr. 1024. Dr. White also observed that Jones "did not answer any questions with a straight answer, instead she answered with indirect answers." Tr. 1025. He noted that she had no problems with her understanding, coherency, and concentration. *Id.* He concluded that Jones' "alleged limitations are not wholly credible as they are not supported by the EOR." He then listed the activities that Jones stated she was able to perform—laundry and household chores, helping her children with their homework, preparing meals, driving a vehicle to all of her necessary appointments, shopping for groceries, paying bills and managing accounts, crochets and cross stiches, watching television, using a computer to access the Internet, attending church semi-regularly, following both written and spoken instructions well as well as paying attention for up to 30 minutes. *Id.* Dr. White opined that Jones "is somewhat limited by depression, but the impact of these symptoms does not wholly compromise…

[her] ability to function independently, appropriately, and effectively on a sustained basis." *Id.*

On April 13, 2011, Dr. John Dufor issued a Physical Residual Capacity Assessment. Tr. 1031. Dr. Dufor opined that Jones could lift and/or carry 20 pounds occasionally and 10 pounds frequently. Dr. Dufor also found that Jones could stand and/or walk for a total of 6 hours in an 8-hour workday, and sit for a total of 6 hours in an 8-hour workday. Dr. Dufor also opined that Jones' ability to push and/or pull was unlimited. Tr. 1032. Dr. Dufor did not find that Jones had any postural, manipulative, visual, communicative or environmental limitations.

## IV. APPLICATION FOR BENEFITS AND ALJ HEARING

Jones applied for social security benefits on December 14, 2010. Tr. 155, 164. She alleged that her onset of disability was on November 8, 2010. Jones' request for benefits was denied initially and upon reconsideration. She requested a hearing before an ALJ, which took place before ALJ Susan Soddy on May 21, 2012. Tr. 30. At the hearing, Jones was represented by an attorney. Her husband and her best friend, whom Jones' attorney described as Jones' "home healthcare worker," were also present. Tr. 35.

At the hearing, Jones testified that she lived with her husband, her three sons (ages 11, 14 and 19), and her best friend. Tr. 36. Jones testified that her best friend had moved in six months before the hearing because Jones was not able to "take care" of her house or cook. Tr. 61. Jones also stated that, "[her best friend] basically watches me to make sure that I'm okay and I don't fall. When I take my medication, I get really loopy and sometimes I get to where I don't see where I'm going and start to trip and so she will

prevent that from happening." Tr. 62. Jones reported finishing high school and some college courses, and confirmed that she could read and write and multiply "by paper." Tr. 38. She also confirmed that she could manage her own finances. *Id.*

Jones stated that her last day of employment was in November 2010, and that she had not worked at all in 2011. Tr. 40. Jones described her past work as a school bus driver from 2002 to 2009, and as a Wal-Mart cashier from November 2009 to April 2010. Jones testified that she was "let go" from Wal-Mart because of the medications she took and because she was unable to perform her duties. Tr. 45. In April 2010, Jones worked as a night security guard, but was fired from this job "because of the medications that I take." Tr. 41-44, 44.

Jones testified at length about her medical history, beginning with the surgery on her right knee in November 2003. She admitted that she had been told that her obesity contributed to her knee problems, and that she had been told to lose weight. Tr. 47. She described injuring her knee a second time at Wal-Mart. *Id.* She also reported that her second knee surgery was in February 2007. Tr. 48. Jones testified that, even though she attended physical therapy sessions before and after the second surgery, she still had problems with her knee—"It pops, it grinds. I can't bend down or stoop because it locks up on me." *Id.* She also stated that her knee injury caused her to have difficulty getting in and out of the bathtub and putting on her shoes. *Id.* After this second surgery, Jones was released to return to work at Wal-Mart, but the limitations added to her work release meant that she could no longer perform her job. Tr. 49. She continued to work as a school bus driver, even though she sometimes had to drive with her left leg and she had

pain when walking.  Tr. 50.  Jones stated that she had a third surgery on her right knee in 2009, but that this third surgery did not resolve her knee pain.  Tr. 51.  Instead, Jones stated that doctors had told her "there's nothing that they can do.  If [she] fall[s] on it again, that they have to do a knee replacement."  *Id.*  After the third surgery, Jones stated that she was unable to drive a bus and that she could not find other employment because "other jobs wanted two years experience with working as a receptionist or a secretary and they wanted some kind of a degree and I don't have any of those."  Tr. 52.  Due to her right knee problems, Jones stated that she could stand for no more than fifteen minutes before she had to go lie down and elevate her leg.  Tr. 52.

Jones then described a series of operations on her "stomach," including a hysterectomy in 2008.  She testified that she still had pain when bending and stooping stating, "the pain, it makes me double over because it hurts so bad."  Tr. 54.  Jones also described swelling in her legs, testifying that she elevated her legs to reduce the swelling for two to three hours per day.  Tr. 55.

Jones next described her "sinusitis," stating that, despite sinus surgery, she still had sinus "attacks" brought on by rain, pollen, or humidity.  Tr. 56.  During these attacks, Jones described having a headache for two hours that rendered her unable to concentrate—"I lay in my bed and I turn all the lights off and I close my door, where there is no sunlight or light."  Tr. 57.  Due to these sinus problems and back pain, Jones claimed that she missed up to two days per week of work when she worked as a security guard in 2010.  *Id.*  She also stated that she suffered from migraine headaches at least once a week and that these headaches lasted from one to two hours.  Jones claimed that

these headaches left her unable to concentrate or do any type of work and that she missed work about twice a month as a result. Tr. 58.

Jones also testified that she had suffered from back pain since 2008, and that she had been told she was not a candidate for back surgery even though "from my L1 to my L4 is damaged. They said that the only reason[] why I can't get back surgery is because I'm only a few centimeters from being protruded into my spine." Tr. 63. Jones testified that she could not put on her shoes because "my back locks up and I can't get up and I need assistance." *Id.* She rated her daily back pain at "a ten." Tr. 64. Next, Jones testified that she had been diagnosed with fibromyalgia by Dr. Barton, and that he had referred her to a pain management specialist. *Id.* Jones also described a shoulder injury in 2011 that resulted in "some aching pain . . . every once in a while." Tr. 65.

Finally, Jones stated that she been on medications for depression since 2008, including Valium, Prozac and Trazodone. *Id.* Although she admitted that her medications helped "to a certain extent," she also stated that she still suffers from crying spells up to two or three times per day. *Id.*

Jones' husband also testified. He stated that Jones had continued problems after her first knee surgery, and that he performed the majority of the household chores. Tr. 69. He also testified that Jones needed to lie down, off and on, "all day long" for a total of three hours and that she needed to elevate her legs. Tr. 70. He also testified that Jones sometimes needed assistance in dressing herself. Tr. 71.

Robert Cox, an impartial vocational expert ("VE"), also testified. The VE testified that Jones' work as a bus driver was medium, semi-skilled work; that her job as a security

guard was light, semi-skilled work; and that her work as a cashier at Wal-Mart was light, semi-skilled work. Tr. 73-74. The ALJ asked the VE whether there were any jobs that could be performed by a hypothetical person of Jones' age, educational background, and work experience, who also had the additional limitations of not being able to climb ropes, ladders or scaffolds; was limited to simple, routine work that did not require more than occasional contact with the public; was only able to bend, twist, stoop and squat occasionally; and who could not work in any environment with concentrations of air pollutants or irritants. Tr. 74. The VE testified that such a person could perform "quite a few" sedentary, unskilled jobs such as small parts inspector, surveillance system monitor, and charge account clerk. Tr. 75. The VE testified that these jobs existed in significant numbers in the national and local economy. Next, the ALJ asked the VE whether such a hypothetical person, who was also limited by (1) severe pain and psychologically-based symptoms that caused loss of concentration and attention to tasks, and (2) difficulties in attendance and ability to perform work on a regular basis, would be able to find work. The VE testified that such a person would not be able to find work. Tr. 75. Jones' attorney then cross-examined the VE, asking whether a person who could otherwise perform sedentary work but who could not bend, stoop, climb, or twist at all could find work. The VE answered, "[t]he jobs that I mentioned aren't characterized by requiring those kind of postural activities, so they would remain." Tr. 76. However, the VE stated that such a person, if they also needed to elevate their legs or lie down for two hours a day, or if they were unable to concentrate for two to three hours per day, would not be able to find work; nor would a person who was absent from work more than two days per

month.  Tr. 76-77.   Jones' counsel asked whether a person who had "paranoid thoughts" for one hour per day could find work.  The VE responded that such thoughts, if they were so intrusive or distracting that they prevented a person from working, would indeed prevent employment.  Tr. 77.

## V.      THE ALJ'S DECISION

After the hearing, ALJ Soddy issued an opinion finding that Jones was not disabled from November 8, 2010 through the July 10, 2012 decision.  The ALJ found that Jones was insured through September 30, 2014, and that Jones had not engaged in substantial gainful activity since November 8, 2010.  She did, however, note that Jones had performed some part-time work in 2011.  Tr. 15.

The ALJ found that Jones suffered from the severe impairments of "obesity, fibromyalgia, depression, chronic sinusitis, right knee internal derangement status post three knee surgeries and degenerative disc disease of the lumbar spine."  Tr. 15.  The ALJ noted Jones' allegation of fibromyalgia, but observed that "fibromyalgia has not been documented according to the criteria of the American College of Rheumatology."  The ALJ also noted Jones' allegation of shoulder pain and polycystic ovarian disease, as well as her past treatment for diabetes, but determined that these were not severe impairments.  Tr. 15-16.   Next, the ALJ determined that Jones did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 16.  The ALJ specifically addressed Listing 1.01, 1.02a, 1.04, and 12.04, as well as the effect of obesity as outlined in SSR 02-1p.

The ALJ determined that Jones had the residual functional capacity ("RFC") to perform sedentary work, "except that she cannot not climb ropes, ladders or scaffolds." Jones was additionally limited to simple routine work that did not require more than occasional contact with the public; only occasional bending, twisting, stooping, and squatting; and no work in an environment with a concentration of air pollutants/irritants. Tr. 18-19. The ALJ's RFC analysis reviewed the testimony regarding her symptoms. The ALJ found that Jones' testimony was not "entirely credible regarding the severity of her symptoms and their effect on her ability to perform work related activities." The ALJ particularly noted that Jones' prior written description of her activities differed from her testimony. Tr. 19.

The ALJ also reviewed the medical evidence in the record, including the opinions of Dr. Feldman and Dr. White. The ALJ noted that there was no objective medical evidence in the record to support Jones' allegations that her pain was not alleviated by medication or that she needed to elevate her legs on a regular basis. The ALJ reviewed the evidence regarding Jones' depression, and noted that her difficulties were primarily self-reported and not substantiated by medical personnel. Tr. 21.

Based upon this RFC, the ALJ found that Jones was unable to perform any of her past relevant work, but that jobs existed in significant numbers in the local and national economy that Jones could perform. Tr. 23. In making this finding, the ALJ relied on the VE's testimony and noted that the jobs listed by the VE were "merely representative samples and other jobs exist in significant numbers in the national economy that such an individual could perform." Tr. 23.

## VI. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d. 1069, 1075 (5th Cir. 1994). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008); Fed. R. Civ. P. 56(a), (c); *Celotex Corp.*, 477 U.S. at 322-23. "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV, Inc. v. Robson*, 420 F. 3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## VII. STANDARD OF REVIEW

When judicially reviewing a determination that an applicant is not entitled to benefits, this Court is to determine: "(1) whether the Commissioner applied the proper legal standard; and (2) whether the Commissioner's decision is supported by substantial evidence." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002); *see also* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept to support a conclusion."

*Randall v. Astrue*, 570 F.3d 651, 662 (5th Cir. 2009). A finding of no substantial evidence is warranted only "where there is a conspicuous absence of credible choices or no contrary medical evidence." *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (internal quotation marks and citation omitted). The Court may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute the Court's judgment for that of the Commissioner. *See Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007).

## VIII. ANALYSIS

Jones raises two points of error to contend that she is entitled to summary judgment. She first challenges the ALJ's finding that her testimony about her symptoms was not wholly credible, arguing that the ALJ improperly dismissed medical evidence that corroborated her testimony. Next, she argues that the ALJ's assessment of her RFC was not supported by the evidence and that the ALJ "failed to recognize the full severity and limited effects of [her] impairments."

### A. Statutory Basis for Benefits

Jones applied for both Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. Title II of the Social Security Act authorizes SSDI benefits. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled. *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability). SSI benefits are authorized by Title XVI of the Social Security Act, and provide an additional resource to the aged, blind, and disabled to ensure that their income does not fall below the poverty line. 20 C.F.R. § 416.110. Eligibility

for SSI is based on proof of disability and indigence.  *See* 42 U.S.C. § 1382(c)(a)(3) (definition of disability); 42 U.S.C. § 1382(a) (financial requirements).  Although these are separate and distinct programs, applicants to both programs must prove "disability" under the Act.  *See* 42 U.S.C. § 423(d)(1)(A) (SSDI); 42 U.S.C. §1382(c)(3)(A) (SSI). The law and regulations governing the determination of "disability" are the same for both programs.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

### B.  Determination of Disability

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).  A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques. *Id*. §§ 423(d)(2)(A), 1382c(a)(3)(D).

A disability claim is examined in a five-step sequential analysis to determine whether: "(1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past

relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the claimant is determined to be disabled, the determination is conclusive and the inquiry ends. *Id.*

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform. *Id.* The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545, 416.945. The Commissioner assesses a claimant's RFC before proceeding from step three to step four. *Id.* Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut the finding. *Id.*

### C. ALJ's Credibility Finding

Jones challenges the ALJ's finding that Jones' testimony about her symptoms and limitations was not wholly credible. The ALJ's found that "[Jones'] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with … [the] residual functional capacity assessment." Tr. 19. Jones argues that the ALJ did not fully consider the factors set out in SSR 96-7p when evaluating her subjective complaints. The Court finds this argument unpersuasive.

SSR 96-7p provides guidelines for reviewing the credibility of a claimant's statements regarding their symptoms. SSR 96-7 states that the "[a]ssessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record." SSR 96–7p, 1996 WL 374186, at *4 (July 2, 1996). Based upon his evaluation of the record, the ALJ "may find all, only some, or none of an individual's allegations to be credible." *Id.* Such credibility findings "are precisely the kinds of determinations that the ALJ is best positioned to make." *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). As such, they are "entitled to considerate judicial deference." *Haywood v. Sullivan*, 888 F.2d 1463, 1470 (5th Cir. 1989); *Guerrero v. Barnhart*, 214 F. App'x 485, 486 (5th Cir. 2007).

In this case, the ALJ thoroughly reviewed the medical evidence in the record and compared it to Jones' own testimony about her symptoms. The ALJ first summarized Jones' testimony and written statements, noting multiple inconsistencies in Jones' own report of her limitations and symptoms. Tr. 19. Next, the ALJ reviewed the testimony of Jones' husband and noted inconsistencies in those statements. In particular, the ALJ noted that Jones' report of her daily activities such as doing laundry, cooking, driving, shopping, caring for her dog, using the computer and caring for her children conflicted with her testimony at the hearing and thus "tend[ed] to reflect poorly on [her] credibility." Additionally, the ALJ conducted a thorough review of the medical evidence, beginning in November 2010. The evidence that Jones relies upon to undermine the

ALJ's credibility finding consists of self-reported symptoms, or were addressed and discussed by the ALJ in her opinion.

Accordingly, the Court finds that the ALJ did not err when evaluating the credibility of Jones' testimony, and that substantial evidence supports the ALJ's credibility finding.

### D. ALJ'S RFC Assessment

Next, Jones contends that the ALJ's RFC determination is not supported by substantial evidence. A claimant's RFC is "the most [a claimant] can do despite [her] limitations." 20 C.F.R § 404.1545(1). The ALJ determined that Jones retained the RFC to perform sedentary work, subject to certain limitations. Tr. 74. Jones contends, however, that the evidence shows that she was not capable of performing any work on a sustained basis and is therefore disabled. The Court disagrees.

"A person's 'residual functional capacity' is determined by combining a medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (citation omitted). An RFC assessment is based on all evidence, including medical evidence. *See* SSR 96–8p, 1996 WL 374184, (July 2, 1996). In determining a claimant's RFC, the Commissioner must consider the claimant's impairments and any related symptoms including pain that may cause limitations affecting the claimant's abilities in a work setting. 20 C.F.R. § 416.945(a). However, the Commissioner is *not* required to consider impairments that are not medically determinable through medically relevant and other presented evidence. *See* 20 C.F.R.

§ 416.929(a). Jones relies on *Johnson v. Bowen* to assert that a "finding of no substantial evidence is appropriate if there is a conspicuous absence of evidentiary choices or contrary medical finding to support the Commissioner's decision." *Johnson v. Bowen*, 864 F.2d 340, 343-344 (5th Cir. 1988).

Jones' contention that the ALJ erred in assessing her RFC is based, for the most part, on her own subjective testimony. This is the very testimony that the ALJ found was not credible in light of the objective medical evidence. Jones does not point to any physician's opinion imposing specific, work-related limitations, nor does she point to any objective medical tests or records to show that the ALJ's RFC determination was not supported by substantial evidence. Further, Jones does not explain which parts of the RFC are in error. Instead, her motion makes a blanket assertion that the ALJ's RFC finding is not supported by substantial evidence, and she again summarizes her own subjective testimony about her limitations. As the ALJ pointed out, much of Jones' own testimony is contradicted by her own medical records, or is unsubstantiated by any objective medical evidence. The vast majority of Jones' complaints are not supported by the objective findings in the medical records, or are adequately controlled by prescribed and over the counter medications.

As the Court has previously noted, the ALJ's opinion thoroughly reviewed the medical evidence and the ALJ, at some length, weighed the objective medical evidence against Jones' own conflicting statements. Based upon its own review of the evidence and the ALJ's opinion, the Court finds that the ALJ's RFC determination was supported by substantial evidence.

## CONCLUSION

A review of the entire record reveals the ALJ applied appropriate legal standards in making this determination. Additionally, substantial evidence supports the determination that Jones is not disabled under the Social Security Act. A review of the pleadings, the discovery and disclosure materials on file, and affidavits establishes that there is no genuine issue as to material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(c).

Accordingly, this Court **recommends** that Jones' Motion for Summary Judgment be **DENIED** and the Commissioner's Motion for Summary Judgment be **GRANTED**. The parties have 14 days from service of this Memorandum and Recommendation to file written objections. Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See* FED. R. CIV. P. 72.

Signed at Houston, Texas on this 6th day of January, 2015.

*George C. Hanks Jr*

**George C. Hanks, Jr.**
**United States Magistrate Judge**